[Crim. No. 2261. In Bank.—September 10, 1920.]

## Ex parte EARLE M. DANIELS, on Habeas Corpus.

[1] MUNICIPAL CORPORATIONS—OWNERSHIP OF STREETS.—The streets of a city belong to the people of the state and every citizen of the state has a right to the use thereof, subject to legislative control.

[2] ID.—REGULATION OF TRAFFIC—DOUBT AS TO MUNICIPAL AFFAIR—RULE GOVERNING DETERMINATION.—While it is true that the regulation of traffic upon a public street is of special interest to the people of a municipality, it does not follow that such regulation is a municipal affair, and if there is a doubt as to whether or not such regulation is a municipal affair, that doubt must be resolved in favor of the legislative authority of the state.

[3] ID.—REGULATION OF STREET TRAFFIC — SUPREMACY OF GENERAL LAWS.—The regulation of traffic upon the streets of a city is not one of those municipal affairs in which by section 6, article XI, of the constitution, chartered cities are given a power superior to that of the state legislature, but such power is subject to the general laws of the state, and if inconsistent therewith is invalid.

[4] MOTOR VEHICLE ACT—SPEED LIMITATIONS—CONSTRUCTION OF STATUTE.—In the construction of the provisions of the motor vehicle law (Stats. 1917, p. 382; Stats. 1919, p. 223), which fix the maximum rates of speed upon the streets and highways and which prohibit municipalities from fixing as a maximum lesser rates, the court is bound to give a construction which will be both constitutional and effective if it can be done without violence to the language used in such provisions.

[5] ID.—UNREASONABLENESS OF SPEED—QUESTION FOR JURY.—Section 22(d) of the Motor Vehicle Act of 1919 (Stats. 1919, p. 223), evidences an intent on the part of the legislature that the restriction that the speed of vehicles cannot be unreasonable and unsafe shall be the test of the legality of the speed at any place within the state, and involves the right to have that question determined by a jury rather than by a local legislative body.

[6] ID.—PENALTY FOR VIOLATION OF ACT—CONSTITUTIONAL LEGISLATION.—The provision of the motor vehicle law making it unlawful to travel at an unreasonable or unsafe speed and punishing the violation of such law as a crime is valid and constitutional legislation.

[7] ID.—VOID MUNICIPAL ORDINANCE—CONFLICT WITH MOTOR VEHICLE LAW.—A municipal ordinance fixing a speed limit of fifteen miles an hour is void where the motor vehicle law fixes a greater speed limit within such municipality.

APPLICATION for Writ of Habeas Corpus to secure release on a charge of driving an automobile in violation of city ordinances. Granted.

The facts are stated in the opinion of the court.

David R. Faries, Ivan Kelso, John W. Stetson, Martin F. Forrest and Earle M. Daniels for Petitioner.

Charles S. Burnell, City Attorney, Jess E. Stephens, Assistant City Attorney, James G. Leovy, Deputy City Attorney, and James H. Howard for Respondent.

George Lull, City Attorney, and Maurice T. Dooling, Jr., Assistant City Attorney, *Amici Curiae.*

WILBUR, J.—Petitioner was charged with the offense of driving an automobile within the limits of the city of Pasadena on the 28th of April, 1919, in violation of a municipal ordinance of the city of Pasadena prohibiting a greater rate of speed than fifteen miles an hour at the place in question. It is stipulated that the Motor Vehicle Act of 1917 (Stats. 1917, p. 382), then in force, permitted the driving of a motor vehicle at a speed not exceeding twenty miles an hour at that place, and that the petitioner was not exceeding that limit. The Motor Vehicle Act of 1917 not only fixed the maximum rate of speed there at twenty miles an hour, but expressly prohibited municipalities from fixing as a maximum a lesser rate of speed. (Motor Vehicle Law, Stats. 1915, p. 397; Stats. 1917, sec. 22, subd. (d), pp. 382, 406.) If there is a conflict between this statute and the municipal ordinance, the question as to which controls is to be determined by the provision of the state constitution. When this case was originally presented it was conceded by the parties that there was a conflict between the city ordinance and the Motor Vehicle Act, and that the sole question involved in the case was whether the municipal ordinance should prevail over the statute because the matter of the regulation of traffic upon the streets of cities was a municipal affair within the meaning of the constitution, which gave supremacy to cities acting under charters in municipal affairs. (Const., sec. 6, art. XI.) The court having tentatively arrived at the conclu-

sion that the regulation of street traffic within municipalities was not a municipal affair, was impressed with the fact that the attempt of the legislature to prohibit the enactment of municipal ordinances regulating speed might be an unconstitutional interference with the regulatory powers granted by the constitution itself to municipalities by article XI, section 11, of the constitution, which provides that "any county, city, town, or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws." That matter not having been touched upon in the original presentation, the case was placed upon the calendar for reargument, and additional briefs were submitted upon this question. The respondent upon reargument took the position that the ordinance was not in conflict with the state law, and therefore claims that even conceding that the matter of traffic regulation is not a municipal affair, the ordinance is nevertheless valid as an exercise of police power not in conflict with general law. Since the argument of this case several matters have been presented to us bearing upon the questions involved. In *Ham* v. *County of Los Angeles* (Cal. App.), 189 Pac, 462, the appellate court, division two, second district, determined that a county ordinance fixing a speed limit at five miles an hour on bridges was not in conflict with the Motor Vehicle Act of 1913 (Stats. 1913, p. 639). An application for hearing in this court was denied. (189 Pac. 462.) In *Mann* v. *Scott,* 180 Cal. 550, [182 Pac. 281], it was held that there was no conflict between the provisions of the Motor Vehicle Act of 1913, which required that a motor vehicle be operated with due care and caution when it overtakes a street-car which has stopped on a city street to take on or discharge persons, and be brought to a full stop if reasonably necessary for the safety of the passengers, and a municipal ordinance which required that the vehicle in all cases be stopped at a distance of ten feet in the rear of the stopped car. It was held that the municipal ordinance merely imposed new and additional regulations in furtherance of the general purpose of the law. In *Helmer* v. *Superior Court of the County of Sacramento* (Cal. App.), 191 Pac. 1001, decided by the appellate court of the third district, it was held that the regulation of street traffic was not a municipal affair within the meaning of the constitutional

provision, and this court having reached the conclusion that it was not a municipal affair denied a petition for transfer to this court. In view of these decisions it will only be necessary for us to briefly indicate our reasons for the conclusion that the regulation of street traffic is not a municipal affair within the meaning of that term as used in the constitution which gives supremacy to the city in municipal affairs. It is the usual practice throughout the United States to delegate to municipalities power to regulate street traffic within the municipality. This practice is followed by the city of Pasadena, whose charter expressly authorizes such control. (Charter of Pasadena, art. VIII, sec. 10, subd. 27; Stats. 1901, p. 906; Id., art. XIII, sec. 1; Stats. 1913, p. 1466.) [1] The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control. (*People* v. *County of Marin*, 103 Cal. 223, 232, [26 L. R. A. 659, 37 Pac. 203]; Elliott on Roads and Streets, 3d ed., secs. 25, 505, 543, 544, 1112, 1115; 3 Dillon on Municipal Corporations, 5th ed., sec. 1122.) The right of control over street traffic is an exercise of a part of the sovereign power of the state. (Elliott on Roads and Streets, sections cited, *supra*.) [2] While it is true that the regulation of traffic upon a public street is of special interest to the people of a municipality, it does not follow that such regulation is a municipal affair, and if there is a doubt as to whether or not such regulation is a municipal affair, that doubt must be resolved in favor of the legislative authority of the state. The rule is that ''any fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation and the power is denied.'' (*Hyatt* v. *Williams*, 148 Cal. 585, 587, [84 Pac. 41, 42], citing *Von Schmidt* v. *Widber*, 105 Cal. 157, [38 Pac. 682]; Dillon on Municipal Corporations, secs. 89, 91. See Dillon on Municipal Corporations, 5th ed., secs. 237, 239; *Gassner* v. *McCarthy*, 160 Cal. 82, 84, [116 Pac. 73]; *Oro Electric Corp.* v. *Railroad Com.*, 169 Cal. 466, 477, [147 Pac. 118]; *Hayne* v. *San Francisco*, 174 Cal. 185, 186, [162 Pac. 625]; *City of Long Beach* v. *Lisenby*, 175 Cal. 575, [166 Pac. 333].) In dealing with a conflict between state and local legislation on the subject of street traffic the supreme court of Oregon in *State ex rel.* v. *Port of Astoria*, 79 Or. 1, 10, [154 Pac. 399, 402], thus expressed the rule:

"While the prime purpose is to ascertain and give effect to the intention as expressed in the language employed, yet the two sections now being considered are designed to grant attributes of sovereignty to specified local subdivisions, and, such grant being a limitation on the power of the legislature, it should be strictly construed, as was properly held in *Thurber* v. *McMinnville,* 63 Or. 410, [128 Pac. 43]." The same rule of construction has been applied in dealing with the powers of municipalities in those states which recognize that municipalities have certain inherent powers, and there great reluctance has been expressed to interfere with the legislative assumption of authority in a case where the rights of a municipality were so difficult of ascertainment, "because of the manifest impossibility of indicating any distinct boundary to the powers which may lawfully be exercised by the legislature in matters of local concern; an embarrassment much more serious than can possibly exist in most cases where a distinct and specific inhibition of the constitution is supposed to be disregarded. . . . Under such circumstances, with no unmistakable signs to guide us between the domain of state and local powers, it becomes us to exercise more than the usual caution not to refuse the sanction of judicial authority to legislation which is supposed to have exceeded a boundary so difficult to locate and define." (*People* v. *Common Council of Detroit,* 29 Mich. 108. See, also, *People* v. *Hurlbut,* 24 Mich. 44, [9 Am. Rep. 103]; *People* v. *Common Council of Detroit,* 28 Mich. 228, [15 Am. Rep. 202]; *Indiana Ry. Co.* v. *Calvert,* 168 Ind. 321, 324, [11 Ann. Cas. 635, 10 L. R. A. (N. S.) 780, 80 N. E. 961].) Under the constitution of Oklahoma it has been held that in municipal matters the charter supersedes the general laws of the state in conflict therewith (*Owen* v. *Tulsa,* 27 Okl. 264, [111 Pac. 320]; *Lackey* v. *State ex rel. Grant,* 29 Okl. 255, [116 Pac. 913]; *Mitchell* v. *Carter,* 31 Okl. 592, [122 Pac. 691]; *Oklahoma Ry. Co.* v. *Powell,* 33 Okl. 737, [127 Pac. 1080]; *In re Simmons,* 4 Okl. Cr. 662, [112 Pac. 951], but that such charter cannot conflict with the general laws of the state. (*State ex rel. Burns* v. *Linn,* 49 Okl. 526, [Ann. Cas. 1918B, 139, 153 Pac. 826].) Notwithstanding this holding that the charter powers of the city are supreme in municipal matters, in *Ex parte Shaw,* 53 Okl. 654, [157 Pac. 900], it was held

that the state law regulating traffic controlled local ordinances in conflict therewith. In a recent case the supreme court of Oregon has held that the ordinances of municipalities are supreme under the constitution of that state and supersede the state legislation on that subject within the municipality. The constitution of that state, however, is so different from ours that that decision is not authority for the construction of our constitution. [3] We, therefore, conclude that the regulation of traffic upon the streets of a city is not one of those municipal affairs in which by the constitution chartered cities are given a power superior to that of the state legislature, but that such power is subject to the general laws of the state, and ordinances inconsistent therewith are invalid.

We will now consider whether or not there is such a conflict. The legislature which met in January, 1915 (Stats. 1915, pp. 397, 410), added the following clauses, which were subsequently incorporated in the legislation of 1917 (Stats. 1917, p. 406) and 1919 (Stats. 1919, p. 223) : "Limitations as  to the rate of speed herein fixed shall be exclusive of all other limitations fixed by any law of this state or any political subdivision thereof. Local authorities shall have no power to enact, enforce or maintain any ordinance, rule or regulation in any way in conflict with, contrary to or inconsistent with the provisions of this act, . . . and no such ordinance, rule or regulation of said local authorities heretofore or hereafter enacted shall have any force or effect, excepting, however," in certain matters which need not now be considered. It must, of course, be conceded that a mere prohibition by the state legislature of local legislation upon the subject of the use of the streets, without any affirmative act of the legislature occupying that legislative field, would be unconstitutional and in violation of the express authority granted by the state constitution to the municipality to enact local regulations. In other words, an act by the state legislature in general terms that the local legislative body would have no power to enact local, police, sanitary or other regulations, while in a sense a general law, would have for its effective purpose the nullification of the constitutional grant, and, therefore, be invalid. (*City of Freemont* v. *Keating,* 96 Ohio St. 468, [118 N. E. 114], holding invalid section 6307 of the General Code.) But it was contemplated by the constitutional provision in question that

the state legislature had the absolute right by general law to enact statutes which would have validity in all parts of the state, including municipalities, and, having done so, local laws in conflict therewith *ipso facto* become void. The legislative declaration that "local authorities shall have no power to enact, enforce or maintain any ordinance, rule or regulation in any way in conflict with, contrary to or inconsistent with the provisions of this act" amounts to no more than the similar constitutional declaration that general laws control municipal police regulations. (Const., art. XI, sec. 11.) If it were to be construed as an attempt to limit the power of local legislative bodies to pass regulations not inconsistent with such general law it would of course be unconstitutional. The provision that "limitations as to the rate of speed herein fixed shall be exclusive of all other limitations fixed by any law of this state or any political subdivision thereof," in so far as it would operate to prohibit municipalities from passing regulations not inconsistent with the general law would for the same reason be unconstitutional. [4] We are bound, however, in the construction of this section of the Motor Vehicle Act to give it a construction which will be both constitutional and effective if it can be done without violence to the language used. It was clearly the intention of the legislature to declare that the limitation upon speed fixed in the law shall be the only limitation controlling the conduct of the driver of a motor vehicle upon the streets and highways of the state. The intent of the legislature in adopting this general scheme for the control of motor vehicles upon the public highways of the state, for the collection of licenses and the appropriation thereof to the improvement of highways, is not to be measured alone by the language used, but by the whole purpose and scope of the legislative scheme. It cannot be doubted that the legislature in enacting section 22(d) with relation to the authority of municipalities to regulate speed intended to occupy the whole field of traffic regulation, and in construing these prohibitory clauses relating to the powers of local legislative bodies, such provisions should not be ignored as unconstitutional, if a reasonable or even a strained construction can be adopted which would give them a constitutional effect. The legislature, however, having complete control of the highways of the

state has as much right by general law to make it lawful to travel ten miles per hour as to make it unlawful to travel fifteen miles an hour. It seems to have been the legislative purpose, by the declaration that "the limitations as to the rate of speed herein fixed shall be exclusive of all other limitations," to authorize vehicles to travel at those limits within cities and counties. Indeed, as all the highways of the state are within either counties or municipalities, and as both have the same legislative power under article XI, section 11, of the constitution, the purpose of the legislature to prevent a reduction of speed limits, and a consequent lack of uniformity in such, is apparent. If this was the legislative purpose, such enactment is clearly within the scope of their constitutional power, and local ordinances fixing other and different rates of speed, *ipso facto* conflict with the state legislation. The difficulty in determining whether or not the state legislature has occupied the whole field of traffic regulation results in part from the form of the legislation. The legislature did not, in terms, authorize a vehicle to travel at any time at the maximum speed limit fixed by the statute for different localities, but prohibited the operation of motor vehicles at any time or place at an unsafe and unreasonable rate of speed (sec. 22[a]) and in effect declares that the speeds of thirty-five, thirty, twenty, fifteen and ten miles an hour are, under circumstances described in the act, unreasonable and unsafe, and, therefore, that it shall be unlawful to operate a motor vehicle in excess of such speeds. It is made a crime to violate any of the provisions of the act (Motor Vehicle Act, Stats. 1917, sec. 32, p. 410; Stats. 1919, sec. 32(a), p. 225), and, therefore, a crime to operate a motor vehicle at a dangerous and unsafe rate of speed at any time within the state. This legislation would seem to occupy the whole field of traffic regulation. But it is contended that in so far as there is an attempt to make criminal the operation of a motor vehicle at an unreasonable rate of speed the law is so uncertain as to be void, and that, therefore, in so far as the statute attempts in terms to make it a misdemeanor to operate a motor vehicle at an unreasonable and unsafe speed the law is unconstitutional and that the city may enact legislation to fill this hiatus in the law. On the other hand, it is argued that the law is valid, and the state having prohibited unreasonable speed, no ordinance of

the city can make any different or other prohibition, for the reason that every ordinance must be reasonable, and to prohibit a reasonable speed would be unreasonable, and that, therefore, no ordinance can be enacted except to prohibit the very thing prohibited by the state law, namely, exceeding a reasonable speed. In effect, however, the local ordinance fixing a different speed limit from that contained in the Motor Vehicle Act is a declaration of the local legislative body to the effect that to exceed the limit thus fixed would be unreasonable. This legislative declaration would be binding upon the courts in the absence of a clear violation of the legislative power. Courts go to great extent in upholding the exercise of such power where it exists. (*Ex parte McKenna,* 126 Cal. 429, [58 Pac. 916]; *Ex parte Berry,* 147 Cal. 523, [82 Pac. 44].) In the prosecution for a violation of the state law the question of whether or not the speed traveled is unreasonable and unsafe is a matter for the consideration of the jury, and the scheme of the legislature authorizes the submission of this question to a jury in a criminal case, called to pass upon the guilt or innocence of a person charged with traveling at an unreasonable speed. The effect of a local ordinance is to foreclose the question of the reasonableness of the speed, and to substitute the judgment of the local legislative body for the judgment of a jury. It is evident that the two plans are in direct conflict and that the conflict is a very material one. Under the state law a motor vehicle driver, provided he keeps within the limits expressly fixed by law, is only confronted with the problem of keeping his vehicle at a speed which reasonable men would conclude to be a reasonable speed. While, on the other hand, he is confronted with an arbitrary rule fixed by a local legislative body, so that he would be wholly within his rights in traveling at a speed of 14.9 miles, and violating a criminal law if traveling at a speed of 15.1 miles, whereas, in fact, it might be much more reasonable to travel at a speed of 15.1 miles sometimes on that particular highway than to travel at a slower rate of speed at other times when the traffic was more congested. The tremendous difference between the two systems of legislation is emphasized by the fact that each county in the state has the same legislative power under the constitution (art. XI, sec. 11) as every city. Thus, every highway in the state, as

well as every city street, is subject to local legislative control, and while the legislature has authorized the citizens of the state to travel upon the highways thereof at a speed which is not unreasonable and unsafe, every part of a trip from Siskiyou to San Diego would be controlled by arbitrary speed limits fixed by legislative bodies whose action he is presumed to know, but of which he is much more likely to be totally unaware. The difficulty is increased by the fact that while the state legislature meets but once in two years and the people of the state not only take notice of the time and place of the meeting, but make an effort to ascertain the results of its deliberations, in the case of local communities the legislative bodies are frequently in continuous session, and, if not, meet at frequent intervals, and can pass regulations of which the general public has no information and of which the courts, other than the police courts of the particular municipalities, will not take judicial notice. It seems, then, that local legislation which determines the question of what speed is reasonable and which forecloses that question in a judicial investigation, is in direct conflict with the legislative scheme by which that question is left open for the determination of a jury. If the legislature had merely fixed the maximum speed limit, it is clear that local legislation fixing a lesser speed limit would not be in conflict therewith, but would be merely an additional regulation. (*Ham* v. *Los Angeles County* (Cal. App.), [189 Pac. 462]; *Ex parte Hoffman,* 155 Cal. 114, [132 Am. St. Rep. 75, 99 Pac. 517].) If we seek to uphold the local legislation by concluding that it is not in conflict with the state law for the reason that the ordinance, as well as the state law, prohibits an unreasonable speed, we are met with the proposition that a local ordinance cannot prohibit exactly the same thing prohibited by the state law and still be valid (*In re Sic,* 73 Cal. 142, [14 Pac. 405]), and the invalidity of such an ordinance is emphasized by the fact that under the scheme of state legislation contained in the Motor Vehicle Act the fines and penalties imposed for its violation are placed in a special fund for the improvement of highways, whereas if imposed for the violation of a municipal ordinance they go into the municipal treasury. Or, if both are valid, a man by traveling at an unreasonable rate of speed has committed two offenses instead of one—one against the municipality

and the other against the state. [5] We conclude, then, that section 22(d) of the Motor Vehicle Act of 1919 evidences an intent on the part of the legislature that the restriction that the speed cannot be unreasonable and unsafe shall be the test of the legality of the speed at any place within the state, and that this involves the right to have that question determined by a jury rather than by a local legislative body.

We have so far assumed that the state law prohibiting an unreasonable speed is not too uncertain to be a valid criminal statute. Numerous authorities are cited upon the question as to whether or not the criminal law therein considered is too uncertain to be enforced. We will not undertake to review the authorities cited on this subject, but will call attention only to those which in our judgment clearly establish the validity of such legislation. In this connection it may be stated that there has been a tendency to a much more liberal construction of such statutes in the more recent decisions, and this may in part be the result of more humane and liberal methods of dealing with those who are convicted of crime, and in part from the wide field now covered by the criminal law. In the *Standard Oil Case*, 221 U. S. 1, [55 L. Ed. 619, 34 L. R. A. (N. S.) 834, 31 Sup. Ct. Rep. 502, see, also, Rose's U. S. Notes], the supreme court of the United States, in interpreting the anti-trust law, adopted what has been characterized as the "rule of reason," holding that this law "really was not a denial of all restraint of trade, but only a denial of an unreasonable restraint of trade," thus leaving to courts and juries the determination of what restraints of trade were unreasonable. It is scarcely to be assumed that this court would read into a statute by construction a provision which, had it been included therein at the time of its enactment, would have rendered the statute void and unconstitutional, because of the uncertainty involved in the use of the very term read into it by the court, namely "reason." In *People* v. *Pearne*, 118 Cal. 154, [50 Pac. 376], the defendant was charged with killing the deceased by driving through the streets of Biggs in a reckless manner and at a great and unusual rate of speed. It was held proper to submit to the jury the question of whether or not the defendant had committed manslaughter in the performance of a lawful act "without due

caution and circumspection." In *Schultz* v. *State,* 89 Neb. 34, [Ann. Cas. 1912C, 495, 33 L. R. A. (N. S.) 403, 130 N. W. 972], a provision of a Motor Vehicle Act identical with that of the California law was held constitutional. A similar statute was held constitutional in *State* v. *Campbell,* 82 Conn. 671, [135 Am. St. Rep. 293, 18 Ann. Cas. 236, 74 Atl. 927], and in *State* v. *Schaeffer,* 96 Ohio St. 215, [Ann. Cas. 1918E, 1137, L. R. A. 1918B, 945, 117 N. E. 220]. An ordinance similar in terms was held constitutional in *Hood & W. Furniture Co.* v. *Royal,* 200 Ala. 607, [76 South. 965]; *Fitzsimmons* v. *Snyder,* 181 Ill. App. 70; *People* v. *Lloyd,* 178 Ill. App. 66; *Commonwealth* v. *Cassidy,* 209 Mass. 24, [95 N. E. 214]; *Chrestenson* v. *Harms,* 38 S. D. 360, [161 N. W. 343]. See, also, *United States* v. *Knight,* 26 Philippine, 217. **[6]** Upon the authority of these cases and our own case of *People* v. *Pearne,* 118 Cal. 154, [50 Pac. 376], we must hold that the provision making it unlawful to travel at an unreasonable or unsafe speed and punishing the violation of such law as a crime is valid and constitutional legislation, although there are cases holding to the contrary. (*Hayes* v. *State,* 11 Ga. App. 371, [75 S. E. 523].) The recent case of *Mann* v. *Scott,* 180 Cal. 550, [182 Pac. 281], is not opposed to the view herein expressed, for that decision is based upon the proposition (180 Cal. 556, [182 Pac. 283]) that "It follows that a conflict, if any, can exist only upon the theory that the ordinance prohibits that which is affirmatively authorized by the Motor Vehicle Act. In short, the appellants are placed under the necessity of contending that that act affirmatively authorizes motor vehicles to pass a stopping street-car in a city whenever the apparent risk involved in so doing would not deter an ordinarily prudent and careful driver. We do not so construe the statute." In this case the petitioner had a right to drive on the highway at a speed that was reasonable and proper under all the circumstances, and the fixing of an arbitrary speed limit by the city authorities restricted that right and was, therefore, in conflict with that right. If the statute had expressly provided that the driver of a motor vehicle could pass a standing street-car whenever it was reasonable and proper so to do, and thus affirmatively authorize him to proceed, the situation would be more nearly parallel. **[7]** We conclude that the city ordinance of Pasa-

dena fixing a speed limit of fifteen miles an hour is in direct conflict with the state law and, therefore, void.

It is proper to say that the Motor Vehicle Act purports to authorize the state highway commission to establish less rates of speed than those provided in the law itself in traversing bridges, viaducts, etc. (Motor Vehicle Act, Stats. 1919, p. 221, sec. 22.) No point is made by the parties with reference to this feature of the act, and we deem it unnecessary to consider the questions of law which might result from this situation, in view of the fact that the same has not been argued or presented. We make this observation solely for the purpose of showing that this point has not escaped our attention and that it is not decided.

Petitioner discharged.

Lennon, J., Lawlor, J., and Sloane, J., concurred.

OLNEY, J., Concurring.—I concur. The main opinion might, however, be taken as holding that the conflict between the city ordinance and the state law which renders the former invalid, was between the provision of the ordinance fixing a maximum speed of fifteen miles an hour and the provision of the state law that no one should travel at an unsafe speed. I do not so view the matter. The conflict in my judgment is with the provision of the state law fixing a different maximum, that of twenty miles an hour. Two things are essential for any law effectively regulating the rates of speed on highways. One is that no one shall exceed a certain speed. The other is that no one shall drive at a speed that is actually unsafe under the conditions which exist at the particular time and place. The two things are quite distinct, and the state law endeavors to provide for both. If the provision of the city ordinance fixing a maximum is in conflict with the state law, it is with the provision of the latter which fixes a different maximum, not with the provision that no one shall drive at an unsafe speed, maximum or no maximum.

If the state law merely provided a maximum which should not be exceeded, without any expression of intention affirmatively to authorize any speed not unsafe less than the maximum, it might well be held under the authority of the milk ordinance case and *Mann* v. *Scott*, 180 Cal. 550, [182

Pac. 281], referred to in the main opinion, that a city ordinance fixing a lesser maximum was not in conflict with it. But this is not, in my judgment, the true construction of the state law. It provides that a man traveling the road shall not travel at an unsafe rate of speed, and in no case in excess of a certain maximum, and also that no other limitation shall be put upon him. This prohibition of any other limitation, viewed purely as a prohibition upon municipalities and counties, is undoubtedly void. Cities and counties, have the right given them by the constitution to pass local regulations not in conflict with the state law, and this right the legislature cannot prohibit them from exercising.

But the prohibition here involved is not to be viewed solely as a prohibition upon counties and municipalities. It is a prohibition designed for the regulation of the speed of those traveling the highways, and clearly designed for the purpose of permitting such parties to travel subject only to the regulations as to rate of speed provided by the state law. Putting it in another way, if the state law had read that a man traveling the highway should not exceed a certain speed, but should have the right to travel up to that speed, provided it was not unsafe for him to do so under the immediate surrounding conditions, there would have been no prohibition on counties and municipalities involved, and no question as to the validity of such prohibition would have arisen. Nevertheless, any local ordinance fixing a lesser maximum would be invalid, as plainly in conflict with the provision of the state law authorizing any speed not unsafe up to the maximum fixed by it. Now, the only difference between such a reading of the state law and its actual reading is that the permission to travel at any speed, not unsafe, up to the maximum fixed, instead of being couched in the affirmative, is put in the negative. The traveler is told, you may not travel at an unsafe speed and you may not exceed a certain speed—safe or unsafe—but any other limitation upon you is prohibited. This can mean but one thing, and that is that the traveler is authorized to travel at any rate of speed he desires, provided he does not travel at an unsafe rate or exceed the limit fixed. It is merely putting in a negative and roundabout way what could better have been said directly and affirmatively. With such a law a city

ordinance fixing another and a lower limit is plainly in conflict.

SHAW, J., Dissenting.—I dissent.  Daniels is charged with driving an automobile faster than fifteen miles an hour over the Colorado Street bridge in Pasadena, in violation of two city ordinances, one forbidding a speed over fifteen miles an hour upon any bridge in the city, the other a speed over ten miles an hour upon that bridge.  The Motor Vehicle Act forbids "a greater rate of speed than twenty miles on hour" at any place in a street "where the territory contiguous thereto is closely built up."  The Colorado Street bridge is contiguous to such territory.  The question is whether the general law or the ordinances shall prevail.

Section 11, article XI, of the constitution provides that "any county, city, town, or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws."

Section 6, article XI, makes city charters and ordinances upon "municipal affairs" paramount, as to such affairs, to general laws, in all cities organized under a freeholders' charter.  Pasadena is a city of that character.  If the matter of the speed to be allowed in the streets of a city is a municipal affair, section 6, of course, settles this case.  Assuming, however, for the present, that it is an affair not wholly municipal, I am of the opinion that these ordinances do not conflict with the Motor Vehicle Act and, consequently, that they are valid under section 11 of the article.

It is a settled rule of decision in this state that where, upon any matter subject to the police power, a city ordinance makes a local regulation tending to afford greater protection to the safety or health of the people than is given by the general laws regulating the same matter, such city ordinance is not in conflict with the general law.  Thus a city ordinance requiring that all milk sold within the city shall contain at least three and one-half per cent of butter fat does not conflict with a general law requiring that all milk sold shall contain at least three per cent of butter fat.  (*Ex parte Hoffman,* 155 Cal. 118, [132 Am. St. Rep. 75, 99 Pac. 517].)  So, also, a county ordinance limiting the rate of speed of vehicles upon bridges to five miles an hour is not in conflict with a state of law fixing a higher rate as the maximum

speed limit thereon. (*Ham* v. *Los Angeles Co.* (Cal. App.), 189 Pac. 462.) And a city ordinance requiring that automobiles overtaking a street-car which has stopped to discharge passengers shall stop ten feet behind the street-car does not conflict with a general law requiring an automobile approaching or passing such car to be operated with due care and caution and to come to a full stop, if reasonably necessary for the safety of such passengers. (*Mann* v. *Scott,* 180 Cal. 550, [182 Pac. 281].) This proposition is apparently conceded by the majority opinion. It does not purport to overrule the decisions above cited, though, in my opinion, it wholly disregards them. The soundness of the principle is obvious and the reasons for it are nowhere better stated than in *Ex parte Hoffman, supra.* They need not be here repeated. The present case, upon this point, cannot be distinguished from *Ham* v. *Los Angeles Co., supra.* A petition for rehearing in this court in that case on that point was denied and it is virtually a decision of this court.

Another rule equally sound and obvious is that the legislature cannot, by general law, purporting merely to forbid the exercise by a county, city, town, or township of the police powers conferred upon it by section 11, article XI, of the constitution, take away or impair such local police power. This, also, the majority opinion admits. It is too plain for argument that the "general laws," in order to conflict with such local police regulations, must themselves contain regulations applicable to the same subject and inconsistent with the local regulations. A general law which does not in itself regulate a particular act, but which expressly or by implication, provides that there shall be no local regulation thereof, would be a legislative attempt to nullify the constitutional grant to the local bodies politic, and would be to that extent, invalid. In such a case the local power would remain and local regulations would be valid.

The Motor Vehicle Act declares that "limitations as to the rate of speed herein fixed shall be exclusive of all other limitations fixed by any law of this state of any political subdivision thereof." (Stats. 1917, p. 406; sec. 22, subd. (d).) It is admitted that this provision, if taken by itself, is void, so far as it relates to the local speed regulations of a city. The provision immediately following it, to the effect that local authorities may not make regulations "in any way

in conflict with, contrary to or inconsistent with'' the provisions of the act is itself inoperative, so far as it purports to limit such local authority, for it is a mere repetition of the constitution on that point. In order to limit the powers of cities the law must provide regulations inconsistent with, and not merely prohibitive of, city regulations.

The majority opinion, while admitting that the legislature cannot, by its mere declaration, forbid the exercise by a city of its police power under section 11, article XI, concludes that it can do so indirectly, in the matter of speed, by first fixing the maximum speed allowable in certain described conditions, and then declaring its own limitations to be "exclusive of all other limitations.'' This it finds to be the equivalent of a law affirmatively authorizing any speed up to the specified maximums under the respective conditions, and it declares that such an enactment by the legislature ''is clearly within the scope of their constitutional power.''

I am unable to see why the original admission does not destroy the final conclusion on this point. The fact that more than twenty miles an hour is unsafe in closely built-up territory and must for that reason be forbidden there (and this is the effect of that clause of the act), is in no wise inconsistent with the fact that more than fifteen miles an hour is unsafe upon a bridge, or with the fact that more than ten miles an hour is unsafe in going over a high and crooked bridge. Hence the legislative declaration that no one shall go more than twenty miles an hour along a road closely built up does not conflict with the municipal declaration that it is unsafe for anyone to go more than fifteen miles an hour over any bridge or more than ten miles an hour over a certain bridge which is high and crooked. Just as richer milk is better than poorer and may therefore be required by local authority, notwithstanding the general law fixing the lower standard, so the slower speed is safer than the higher speed upon bridges and may be required by local authority, notwithstanding the general law fixing a lower standard of safety. The additional legislative declaration that its own limitation of speed shall be exclusive of all municipal speed limitations is entirely distinct and separable from the regulatory clause, and is nothing but a legislative attempt to prevent a city from exercising the police power given to it by the constitution.

This difficulty was apparently perceived, though not admitted, by the majority, for the conclusion that the Motor Vehicle Act prevails over local speed regulations is finally put upon the ground that by another provision of the act the "state legislature has occupied the whole field of traffic regulation," leaving nothing for the local authorities to regulate. This provision is found in the opening clause of section 22 and it reads as follows:

"Any person operating or driving a motor or other vehicle on the public highways shall operate or drive the same in a careful and prudent manner and at a rate of speed not greater than is reasonable and proper, having regard to the traffic and use of the highway, and no person shall operate or drive a motor vehicle or other vehicle on a public highway at such a rate of speed as to endanger the life or limb of any person or the safety of any property; *provided,* that it shall be unlawful to operate or drive at a rate of speed" in excess of certain maximum rates fixed for particular conditions described, including the twenty miles an hour provision in question.

There are, in my opinion, two reasons showing that this clause does not "occupy the whole field" as the majority of the justices say it does.

First, the other provisions of the section force the conclusion that the legislature itself did not so understand it, and especially that it was not considered a sufficient regulation to meet the varying needs of different local conditions, particularly upon bridges. The same subdivision contains a further proviso purporting to authorize the state highway commission to establish "the maximum rate of speed over any *bridge,* dam, trestle, culvert, causeway or viaduct," at less than the "rate established by law," whenever in its judgment the safety of the persons or the protection of the highway "shall be promoted thereby." If the act had already "occupied the whole field" of- regulation, there would have been no occasion for this clause. The insertion thereof in the act shows conclusively that the legislature did not believe that the opening clause in connection with the maximum speed clauses following it, "occupied the whole field" of speed regulation, but did believe that further speed regulations adapted to local conditions would be necessary to insure or promote the safety of persons and property, and

that for that reason it attempted to empower said commission to prescribe the regulations appropriate to the varying local needs.

Second, the language of the opening clause is too vague, uncertain, and indefinite to constitute a sufficient definition of a public offense. Who shall decide whether the rate of speed is "greater than is reasonable and proper," or so great as "to endanger the life" of a person or the safety of property, in the particular circumstances? The conditions are often very complicated. The driver at a crowded crossing, for example, is generally confronted with the necessity of choosing between several alternatives and must decide in an instant which alternative to take and at what speed to drive to escape the greater danger. The clause reads like an instruction to a jury in an action for damages, rather than a penal statute laying down a rule of action for the future and defining the kind of acts that are to be denounced as criminal. It calls for the constant application of the well-known rule that a person suddenly meeting an unexpected danger is not expected to choose his alternatives as wisely as one having time for observation and deliberation, or as a jury reviewing his conduct in the light of the often conflicting and always confusing testimony of excited eye-witnesses. One person might believe the speed excessive, another that it was too slow. The ultimate decision by a jury or judge could never be foreseen. Two persons might participate in the same act of driving and might be tried separately. One jury would deem the speed dangerous and convict one of them; another jury, upon the same evidence, might believe it safe, or reasonably "careful and prudent," and so acquit the other participant. The provision, in its practical effect, with regard to speed, is that no person shall drive at a speed which the jury that tries him, upon hearing the evidence, shall consider fast enough to endanger life, limb, or property. No person could know whether or not he had committed an offense, until after the verdict. The rule is that penal statutes are strictly construed and that in order to be valid the offense must be so defined that a person of ordinary understanding may know therefrom when he is violating its provisions. (*Ex parte Jackson*, 45 Ark. 158; *Czarra v. District of Columbia*, 22 App. D. C. 443; *State v. Gaster*, 45 La. Ann. 636, [12 South. 739]; *Augustine v. State*, 41 Tex.

Cr. Rep. 59, [96 Am. St. Rep. 765, 52 S. W. 77].) "Every man should be able to know with certainty when he is committing a crime." (*United States* v. *Reese,* 92 U. S. 220, [23 L. Ed. 563, see, also, Rose's U. S. Notes].)

It is open to at least grave doubt whether or not the legislature intended to declare a violation of this clause to be a criminal offense, at least with regard to bridges. Section 32 declares that any person who violates any provision of the act is guilty of a misdemeanor. But the opening clause of section 22 does not forbid any specific rate of speed and the section contains no express prohibition of speed less than the respective maximums specified therein. It leaves all lower speeds over bridges and the like, as we have seen, to the regulation of the commission. Since section 32 does not declare it to be a misdemeanor to violate a regulation of the state highway commission on the subject, it is reasonable to suppose that the mere act of driving over a bridge, contrary to such regulation of the commission, was not intended to be denounced as criminal.

If the provision of section 22 purporting to empower the commission to prescribe lower rates of speed over bridges, in connection with the penal clause of section 32, was intended to make the violation of a regulation of the commission a misdemeanor, and was valid in that respect, it might be argued with much force that the "whole field of regulation" was occupied by the general law. But if that provision of section 22 is so intended, it is invalid. It is an attempted delegation to the commission of the legislative power to define criminal offenses and as such it is beyond the power of the legislature. All legislative power is vested by the people in the legislature and in local political subdivisions of the state. (Const., art. IV, sec. 1; art. XI.) The function of defining public offenses requires the exercise of a discretion which the people have committed exclusively to the legislature and the local authorities named. It cannot be transferred by the legislature to any state commission of its own creation. No proposition is better settled than this. (*People* v. *Parks,* 58 Cal. 624; *Ex parte Cox,* 63 Cal. 21; *Harbor Commrs.* v. *Excelsior Co.,* 88 Cal. 491, [22 Am. St. Rep. 321, 26 Pac. 375]; *Ex parte Wall,* 48 Cal. 313; *Hardenburg* v. *Kidd,* 10 Cal. 402; *Ford* v. *Harbor Commrs.,* 81 Cal. 36, [22 Pac.

278]; Cooley on Constitutional Limitations, p. 163; 12 Corpus Juris, 839.)

Furthermore, the regulation and control of the use of streets within a city should not be made a matter exclusively of general concern, but should be classed as, at least in part, a "municipal affair," within the meaning of that phrase as used in section 6, article XI, of the constitution. The cities lay out and improve the streets and build the bridges and viaducts. The cost is paid out of funds raised either by general city taxation or by assessments on adjacent private property specially benefited. It is settled that the doing of these things is a municipal affair in which city ordinances prevail over general laws. (*Sunset Telephone etc. Co.* v. *Pasadena*, 161 Cal. 281, [118 Pac. 796]; *Byrne* v. *Drain*, 127 Cal. 663, [60 Pac. 433]; *Fritz* v. *San Francisco*, 132 Cal. 376, [64 Pac. 566]; *Banaz* v. *Smith*, 133 Cal. 102, [65 Pac. 309]; *Duncan* v. *Ramish*, 142 Cal. 696, [76 Pac. 661].) The cities have the power and it is their duty to keep in repair the city streets, bridges, and viaducts. As a part of that power they should have the right to make all regulations' concerning their use that are reasonably necessary to protect them from injury, and so keep down the expense of repairs. They cannot effectively do this if the state may by general laws provide exclusive regulations. The conditions of local use and local situations will of necessity be so variable, and will be subject to such frequent changes in different parts of the state, that no general law could be framed that would adequately provide for the necessities of each case. Again, many different uses are made of streets that are peculiar to cities and which vary in different cities, according to local customs and desires, such as the projection of awnings, the setting of poles for power and lighting wires and lamps, the laying of conduits and car-rails, and the excavation of areas under sidewalks for access to basements. All of these are held to be municipal affairs upon which ordinances of a city operating under a freeholder's charter are superior to general laws. (*Sunset Telephone etc. Co.* v. *Pasadena, supra.*) This well-considered case appears to have escaped the notice of the majority. Yet if the majority opinion expresses the law, that case stands tacitly overruled on that point and it is within the power of the legislature at any time to enact a general law attempting to regulate all

such uses, and such law would supersede and suspend all municipal ordinances on the subject in every city in the state. The present Motor Vehicle Act concedes to each city the right to regulate traffic at crowded street crossings therein. But if the majority opinion is correct, this is not a municipal affair, and the state could make its own regulations for such places, and provide its own officers to enforce them and if the regulations proved wholly inadequate, or the enforcement thereof wholly inefficient, the only recourse of the people of the city would be to await the next sitting of the legislature, in the hope that out of the inevitably conflicting demands of different localities some sort of relief would be provided by a general law. It is, in my opinion, indisputable that in this state regulations of this kind have always hitherto been regarded as "municipal affairs," and that that phrase was so understood and used in the amendment of section 6, article XI, in 1896, with the intent to make such regulations paramount to general laws.

Angellotti, C. J., concurred.