MANCUSO *v.* YELLOW TAXICAB CO.

1. MUNICIPAL CORPORATIONS — ORDINANCES — STATUTES — MOTOR VEHICLES.

A city ordinance, although providing a rate of speed less than that allowed by the motor vehicle act, is not in conflict therewith, since Act No. 368, Pub. Acts 1921, § 21, recognizes that a speed less than the maximum at street intersections might be unlawful.[1]

2. WITNESSES—CROSS-EXAMINATION—EVIDENCE—OPENING DOOR TO TESTIMONY OTHERWISE INADMISSIBLE.

Cross-examination of defendant's witness by counsel for a co-defendant as to whether she had not testified in recorder's court that she did not see the accident sued on, did not open the door to admit her testimony in said court, over the objection of plaintiff's counsel, where the testimony offered did not contradict that given on cross-examination.[2]

3. DAMAGES—EVIDENCE—TESTIMONY AS TO AMOUNT RECOVERED IN ANOTHER CASE INADMISSIBLE.

Where, in an action for personal injuries, defendant's counsel were allowed wide latitude in inquiring about a later accident to plaintiff, for which she recovered damages,

---

[1]Motor Vehicles, 28 Cyc. p. 36; [2]Witnesses, 40 Cyc. p. 2507.

there was no error in excluding testimony as to the amount she received therefor.[3]

Error to Wayne; Moynihan (Joseph A.), J. Submitted January 7, 1925. (Docket No. 32.) Decided May 14, 1925.

Separate actions of case by Grace Mancuso and James Mancuso against the Yellow Taxicab Company and another for personal injuries. The cases were tried together but separate verdicts and judgments entered. Judgments for plaintiffs. Defendant Yellow Taxicab Company brings error. Affirmed.

*Monaghan, Crowley, Reilley & Kellogg,* for appellant.

*Colombo, Colombo & Colombo,* for appellees.

Moore, J. By stipulation of counsel the above cases were tried as one, but separate verdicts and judgments were entered therein. Grace Mancuso recovered a judgment for $1,500 against the Yellow Taxicab Company, and James Mancuso recovered a judgment of $500 against the Yellow Taxicab Company. The cases are brought into this court by writs of error.

The cases are simplified by a stipulation filed in this court by counsel for the Yellow Taxicab Company that they abandon all assignments of error arising out of the refusal of the trial court to adjourn the trial to enable them to obtain a certified copy of a petition filed in a suit commenced in Cleveland by Mrs. Mancuso against the Cleveland Transfer Company. Counsel also concede that the petition offered in evidence from the Cleveland court was not certified as a true and correct copy, but was an uncertified

[3]Damages, 17 C. J. § 325 (Anno).

petition and duplicate only, as testified to by William Brooks.

The record discloses that on September 14, 1921, about 6:00 a. m. James Mancuso and Grace Mancuso, husband and wife, residents of Cleveland, boarded a taxicab as passengers for hire of the Yellow Taxicab Company in front of the Hotel Tuller in Detroit, to go to the Michigan Central depot to take a train for their home in Cleveland.   At the intersection of Bagley avenue and Second boulevard the Yellow taxicab going west collided with an Overland car driven by defendant Palgut, going in a southerly direction on Second boulevard.

Mr. Palgut was called as an adverse witness.   He testified in part:

"I was the owner of the Overland touring car that was in this accident on Second and Bagley.   I was driving in a southerly direction on Second avenue, on the day of the accident.   I was driving about 20 miles between blocks and I cut down to about 8 when I came there—I looked to the left and right, saw that my way was clear and proceeded on.   No more than I got under way, the Yellow taxicab dashed upon me and before I had a chance to do anything— I tried to turn to the right and at the same time with the terrific speed he was going, I could not help but come in contact with him.   I can judge approximately the speed at which automobiles travel by watching them.   The Yellow taxicab was traveling across the intersection about 30 miles an hour.   The taxicab did not slow at all when it crossed Second avenue.   There is an electric light pole right at the corner of Second; he just missed that by about three feet.   My car was facing west.   The taxicab turned me right around facing west, in the same direction the taxicab was going.   As I got to the corner of Bagley and Second, the Yellow taxicab was not in sight.   I presume there were other cars on that side of the street that obstructed my view.   The taxi did not attempt to turn either direction.   It did not slow down to cross Second avenue."

A witness testified in part as follows:

"My name is James Maguire. I live at 624 Bagley avenue between Second and Third, closer to Second than to Third. I work at the Michigan Central depot. On the 14th day of September, 1921, I was living at 624 Bagley. I recall an accident that happened on the 14th day of September, 1921, in which the Mancusos were injured. I got up and was going to work and started to shave and heard a crash, about 6 and 7, Detroit time. I was in the house; I should judge my place is a distance of 200 feet from Second. I was in the back part of the house. I ran out 'of' the house and I seen a cab turned over on its side, west of Second, nearer my house than what Second is. I rushed over there and I found this couple in the cab. The cab was on its side, tipped over between the curb and sidewalk. When I got there, Mr. and Mrs. Mancuso were in the cab, and I helped to pull them out. I took Mrs. Mancuso into my house, laid her out on the davenport there in the sitting room and my wife tried to restore her to consciousness until the patrol wagon came and took her away, which was maybe about half an hour. She was unconscious when she was brought into my house. The taxicab was approximately—at least 75 feet from the corner when I saw it tipped over,—when it came to a stop, west of the corner. I did not see another automobile there. I did not pay much attention to it because my attention was drawn to aid this lady. Her clothes were mussed up, quite a bit I recall; I believe one of her stockings was ripped open quite a bit; her dress was torn some I think. I never met Mr. Mancuso and Mrs. Mancuso before in my life. The taxicab was headed west on Bagley when I saw it."

The plaintiffs were both sworn and testified that when the Yellow taxicab approached Second boulevard, and when the accident happened, it was running 30 to 40 miles an hour. They testified in detail as to the occurrence and the injuries. They were subjected to a long and able cross-examination. The taxicab driver was not called. It was made to appear that he could not be found. A recordograph was

attached to the taxicab and it was claimed it showed
the speed of the taxicab was but 14 miles an hour
when the accident happened.

A witness was sworn on the part of the defendant
who testified in part as follows:

"I am Mrs. Jessie Stiles; I am at 1732 Fort street.
I did live at 625 Bagley, on the south side of Bagley
avenue, near the intersection of Bagley and Second;
there is just a vacant lot between my place and Second
avenue, one large lot.    I was at home the morning of
the accident in this case.    I saw the accident.    I saw
the taxicab that proceeded along west on Bagley.    I
was sitting in the window; my attention was attracted
to the taxicab first because I heard it blow its horn
a little ways this side of First street.

"*Q.* And how near was the taxicab to Second street
—the taxicab was going west on Bagley; how near
was it to Second street when you first saw it?

"*A.* I saw it coming quite a way down Bagley avenue
from First street.

"*Q.* That is one block is it?

"*A.* Yes, sir.

"*Q.* You say that you noticed or you was attracted
by the blowing of the horn as he proceeded along west
on Bagley toward Second street, what did you see in
reference to his operation of the car?

"*A.* Well, I seen he stopped or came to pretty near
a stop when he got to the corner of Second street and
then he started up and got pretty near across the
street when this other car came and hit him.

"*Q.* The taxi you say was nearly across the street?

"*A.* Yes, it was.

"*Q.* And where did the other car hit the taxicab?

"*A.* In the side.

"*Q.* What happened to the taxicab after the other
car hit it in the side?

"*A.* Turned over.

"*Q.* And where did the other car or the taxicab go
then?

"*A.* It did not go any place; it just turned over.

"*Q.* Where was it when it turned over?

"*A.* On the corner.

"*Q.* On the corner how near to your house?

"*A.* Not very far.

"*Q.* On the same side of the street?

"*A.* On the same side of the street.

"*Q.* Now did you see the other car before it hit the taxicab?

"*A.* No, sir, I did not.

"*Q.* When did you first see the other car?

"*A.* When it hit that car—when it hit the taxi.   I have ridden in automobiles but not qualified to judge of speed of automobiles.

"*Q.* When he arrived at the corner—when the taxicab was driven up to the corner of Bagley and Second you said, that he slowed up or stopped his car; will you describe what you saw—did he stop the car entirely?

"*A.* No, he did not; he slowed up.

"*Q.* Now could you tell how fast—did you have sufficient view of the other car to tell how fast that car was going?

"*A.* No, I did not; no, sir.

"*Q.* Seated at your window did you have a view of Second avenue?

"*A.* No, sir.

"*Q.* That is north from the intersection?

"*A.* No, sir.

"*Q.* What obstructed your view there—what obstructed your view from looking up Second avenue?

"*A.* I could not see up Second avenue.

"*Q.* How far across the street at the corner of Bagley and Second was the taxicab when it was hit by the Overland?

"*A.* It was away across the corner."

It is claimed the court erred in his charge in relation to the ordinances of the city.   Early in his charge the court said to the jury:

"I charge you that a violation of a section of the Michigan motor vehicle law, so-called, is negligence *per se;* that is negligence of itself; whereas the violation of a section of a city ordinance is merely evidence of negligence."

What he said later must be considered in connection with this statement.

The contention of counsel is stated in the brief as follows:

"It is the contention of defendant that the amendment of the statute abrogated the provisions of the ordinance as to speed limit in that townships, cities or villages under the State law can not change the speed limit provided by the motor vehicle act, except in park and parkways.

"While municipalities have the power to pass ordinances governing the use of the highways, such provisions of the ordinances which in any way contravene the general statute affecting automobiles must be held invalid and void.    *People* v. *McGraw,* 184 Mich. 234.

"If there are inconsistencies between an ordinance or a statute, to the extent of such inconsistencies the ordinance must give way and that is true when the act of the legislature follows as well as when it precedes the ordinance.    *Ex parte Smith,* 26 Cal. App. 116."

The City Ordinance No. 737, section 16 of part 2, provides:

"Motor vehicles shall be driven at a rate of speed not to exceed ten miles per hour in the business portions of the city; and outside of the business portions of said city at a rate of speed not to exceed fifteen miles per hour."

Section 8 of part 2 of the same ordinance provides as follows:

"Reckless driving within the meaning of this ordinance shall be deemed to include the following offense which are hereby prohibited.    *    *    *

"Subdivision (e).    Driving at more than one-half the legal rate of speed when entering an intersecting street."

Section 21 of Act No. 368, Pub. Acts 1921 (Comp. Laws Supp. 1922, § 4817), reads:

"Upon approaching an intersecting highway    *    *    * and also in traversing such intersecting highways *    *    *    a person operating a motor vehicle shall

have it under control and operate it at such speed as is reasonable and proper, having regard to the traffic on such highway and the safety of the public."

The legislature, in fixing a maximum speed, recognized by the use of the foregoing words that a speed less than 20 miles per hour at street intersections may be unlawful.    We do not think there is any conflict between the statute and the ordinance.

This court held in a recent case:

"While a speed in excess of the legal limit prescribed in the State law is in itself *prima facie* evidence of negligence, a lower speed may, according to the circumstances, be excessive and evidence of negligence. The rate of speed must always be reasonable and proper, having due regard to existing conditions at the time and place, the lives and safety of the public being the test." *Patterson* v. *Wagner*, 204 Mich. 593.

Complaint is made because the court excluded the testimony of Mrs. Stiles taken in the recorder's court. Counsel for defendant Palgut had cross-examined the witness as follows:

"*Q.* Didn't you tell Judge Faust that you did not see this accident?
"*A.* I did not.
"*Q.* You are sure about that?
"*A.* Yes, sir.
"*Q.* Before Judge Faust.    Judge Faust heard this case over there; and isn't it a fact that you testified before Judge Faust that you did not see this accident?
"*A.* I did not; no, sir."

It is conceded the testimony taken before Judge Faust ordinarily would not have been admissible, but it is insisted the door had been opened by the cross-examination and the testimony should have been permitted.    The testimony offered did not contradict that given on the cross-examination, and as against the objection of counsel for the plaintiffs we do not think the court erred in excluding the testimony.

It developed in the course of the trial that Mrs. Mancuso suffered an accident in a taxicab in Cleveland several months after the one in Detroit, and that suit was brought for her in Cleveland. Counsel sought to show how much she received in settlement of that suit.

The court expressed himself as follows:

"*The Court:* I permitted a very extensive inquiry into all her accidents, but I do not know what bearing it has on it what sum she received; I do not see how that becomes material. I permitted the inquiry at some length as to all her injuries and accidents and all that, but the amount she received I do not think is material. I think it would be getting into rather dangerous territory when you get talking about what she received for this accident or that accident. I have no objection to your finding out what the extent of her injuries were, and I permitted that, but I do not think it is material as to what amount she received for either the first accident or the second accident."

Counsel were given the widest latitude in inquiring about the accident in Cleveland, and we do not think the court erred in excluding the testimony.

The other errors assigned have been considered, but do not call for discussion.

The charge of the court to the jury covers more than 14 pages of the printed record. The testimony was conflicting. The important questions were questions of fact. They were fairly submitted to the jury. We discover no reversible error.

The judgments are affirmed, with costs to the appellees.

McDONALD, C. J., and BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred. CLARK, J., did not sit.